**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| **LADARRIUS PERRY,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 2:24-cv-02986** |
| ) | |
| **v.** ) | |
| ) | |
| **SGT. J. ACRED (9862), individually and** ) | **JURY TRIAL DEMANDED** |
| **as an MPD officer; SGT. J. BOYD (11189),** ) | |
| **Individually and as an MPD officer;** ) | |
| **SGT C. WINBUSH (2876), individually** ) | |
| **and as an MPD officer; Lt. BRIAN** ) | |
| **BEASLEY (2296), individually and as an** ) | |
| **MPD; B. COCKMAN (12733), individually** ) | |
| **and as an MPD officer; C. BEATY (6842),** ) | |
| **individually and as an MPD officer;** ) | |
| **JOHN DOES 1-4, individually and as an** ) | |
| **MPD officers; Chief CERELYN DAVIS, in** ) | |
| **her official capacity; and CITY OF** ) | |
| **MEMPHIS, a municipality,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**SECOND AMENDED COMPLAINT**
**SEEKING DAMAGES FOR DEPRIVATION OF CONSTITUTIONAL RIGHTS**

**COMES NOW,** Plaintiff, Ladarrius Perry (herein Perry), by counsel, brings this

action for compensatory and punitive damages as well as for any and all appropriate relief

and damages demand for trial by jury and states the following:

## I. INTRODUCTION

1.    The Defendants violated then 17-year-old Perry's Fourth and Fifth Amendment rights and as a direct result, Perry was a victim of false arrest, false imprisonment and malicious prosecution.    Additionally, as a result of the Defendants' unreasonable seizure without probable cause and decision to initiate prosecution without probable cause, 17-year-old Perry spent two and a half years awaiting trial for first-degree murder in the Shelby County Jail at 201 Poplar, one of the worst jails in the State of Tennessee.    Seventeen-year old Perry, who was 5'3" and weighed approximately 110 pounds, greatly suffered for two and a half years in the Shelby County Jail at 201 Poplar for a crime that he did not commit.    As a teenager, Perry was housed with adult men and had to engage in fights and lived in constant fear, danger and intimidation for his safety and life.    The jail environment formed Perry's most inquisitive and informative years.    At the time of his arrest on July 18, 2021, Perry had completed the 10th grade and was planning to enter his junior year of high school.    At 12:44.19 (military time), the Defendants' video-taped custodial interrogation of 17-year-old Perry readily displays his youth and naivety through the following verbal exchange at the beginning of the interrogation:

> **Sgt. Boyd: It is very important what we are talking to you about that you be honest ok because everything is riding on you right now as far as your future as to what happen to you. I am going to give you a fair shot and I don't want to see you locked up, especially for the remainder of your fucking natural fucking young life.**
>
> **Perry: I wanna be a senior.    I got to go to the prom.**
>
> **Sgt. Boyd: You need to be honest with us or you probably will not make it to the fucking prom. This is some serious shit.**

2

Not only did Sgt. Boyd's promise materialize because 17-year-old Perry missed prom, but he also missed his high school graduation and countless opportunities to be with his family and friends.    More than two and a half years would pass before Perry would be released.

2.    On December 13, 2023, the day of the motion to suppress hearing, the lone charge of first-degree murder was dismissed for lack of probable cause.    At the hearing, the state prosecutor and the Circuit Judge engaged in the following exchange:

Prosecutor:    He's set for motion to suppress today.

Court: Yes.

Prosecutor:    Upon investigation, the State spoke with Officer Coffman with the Police Department and is asking about whether or not we had probable cause to arrest Mr. Perry.

Court: Uh-huh.

Prosecutor:    -- when it came to bringing him in and having a discussion with him [Perry] about a homicide. The facts of the matter at this point are that there was no p.c. to arrest him when they took him into custody as a juvenile and brought him to MPD homicide where they interrogated him. And he ultimately confessed to the –the death of the victim in this matter. The motion to suppress was two-fold.   It was based on lack of probable cause as well as the issue with the voluntariness of the statement that Mr. Perry gave. We are not going to get into the issue of voluntariness at this point because in the State's assessment, there is no probable cause to arrest which means that we are done at this ---at this time.   So based on that, the State's ethical obligation is to nol-pros the matter.

Court:    All right

Prosecutor:    The victim's mother is present and very upset.   Mr. Perry is present…But that's the State's position, Your Honor.

Court:    All right.    I'm ready to sign unless you've told the victim's mom she can say something or something to the defendant.

3

Prosecutor:    We did not, Your Honor.

Court:    Okay, Pass it forward.

Prosecutor:    This matter is nol-prossed without any cost.

(Exhibit 1 and Exhibit 1A).    Perry then resumed his life of freedom but not without cost, scars, and a lifetime of adjustments.

**A Summary of the Case**

3.    On December 20, 2020, a woman was murdered in the neighborhood and there were no eyewitnesses and basically no leads.    Homicide detectives were unable to develop any concrete suspects based on credible information.

4.    In his investigative report, Sgt. W. Acred, the lead homicide detective, stated, "Detectives located video that showed two unknown males running from the direction of the shooting scene and appeared to run into 3198 Millwood." Sgt. Acred's statement is a knowing and material false statement with reckless disregard for the truth. The video does not support his statement.    In April 2021, relying primarily on the hearsay statements of a juvenile that Sgt. Acred and detectives later learned had lied to them and acting under color of law, Sgt. Acred added Perry as a "person of interest" in Watson, a law enforcement database.    A person of interest is someone who law enforcement believes merit further attention and investigation but does not have nor possess sufficient probable cause to arrest.

5.    On July 18, 2021, as a direct result of Sgt. Acred's actions, entering Perry in Watson as a person of interest, Multi-Agency Gang Unit (MGU) officers, C. Beaty and B. Cockman, without probable cause, seized and arrested Perry on sight, taking him

4

directly and immediately to the Homicide Division of Memphis Police Department (MPD)

for interrogation.   The actions of Sgt. Acred, Officer C. Beaty, and Officer Cockman,

under color of law, not only violated 17-year-old Perry's Fourth Amendment rights by

engaging in a warrantless arrest without probable cause, but revealed a custom, practice,

and lack of proper training and protocol for handling "persons of interest" and juveniles.

6.    The Memphis Police Department (MPD) Homicide Bureau Arrest Report.

states the following:

### **Probable Cause**

On 12/20/20 at 1410 hrs MPD officers responded to a man down call at 462
King road where they located a female suffering from gunshot wounds to
the head and torso.  The female gunshot victim was identified as [the
victim], who was pronounced deceased on the scene.   During the course
of the investigation, Detectives located video that show two unknown males
running from the direction of the shooting scene and appeared to run into
3198 Milwood.    Investigators interviewed resident of 3198 Millwood,
Christopher Sullivan, and discovered that Ladarrius Perry and another
juvenile ran into the residence and to the back around the time of the
shooting.   Ladarrius Perry, male 17 years old, was developed as a person
of interest.   On July 18, 2021, MGU officers were conducting enhanced
patrol in the area of Ford and King and checked a suspicious party who was
identified as Ladarrius Perry.    Ladarrius Perry was detained and
transported to 170 N. Main 10th Floor, Homicide, for further investigation
where he confessed to shooting [the victim] on 12/20/2020 because she
stole a small amount of money from his cousin.

(Exhibit 1).   A cursory examination of the Arrest Report reveals the officers' lack of

probable cause and unlawful detention of then 17-year-old Perry.   Additionally, the full

investigation, including the Report of Narrative, case notes, supplements, and Crime

Scene Investigation (CSI) reports further revealed Officers Beaty and Cockman's

unreasonable seizure of then 17-year-old Perry without probable cause.   Due to their

lack of proper training, Sgt. Acred, Officer Beaty, and Officer Cockman, collectively acted

under color of law and violated 17-year-old Perry's Fourth Amendment rights, causing his unlawful detention, false imprisonment, and malicious prosecution.

7.     Furthermore, the interrogation tactics of Homicide detectives, Sgt. Boyd and Sgt. Winbush, were so outrageous and outside the pale of orthodoxy of proper custodial interrogation techniques that they violated Perry's Fifth Amendments rights.   Perry's video-taped interrogation shows Sgt. Boyd and Sgt. Winbush's deliberate indifference, lack of respect, reckless and total disregard for Perry's constitutional rights.   Their actions are even more egregious because the detectives knew they were being video-taped during their interrogation of Perry and it failed to curtail their illegal actions and improper tactics. This further shows the custom and practices of the MPD in conducting interviews/interrogations, especially as it applies to juveniles.   It also reveals the lack of proper training concerning proper interrogation techniques of Sgt. Boyd and Sgt. Winbush who are very experienced homicide detectives.   Despite the detectives' illegal and improper interrogation tactics, then 17-year-old Perry consistently and constantly maintained his innocence for approximately three hours.

8.     The summary below only highlights a few of Sgt. Boyd and Sgt. Winbush's illegal, reckless and improper actions/tactics:

a.     To intimidate Perry into confessing to a crime that he did not commit, detectives made numerous threats including threats of being raped in prison.   A few of the threats:   At 12:50.10, during the video-taped interrogation,   Sgt. Boyd says, **"You are 17 right now.   What they normally get about 60 or 70 years.   You will be about 80 or 87 getting out of prison and that's if you get a good deal.   You will spend the**

**majority of your life behind bars to get us to swallow that bullshit story." [Perry**

**responds, "I ain't did nothing."].**    At 14:04, Sgt. Boyd later stated to 17-year-oldPerry

the following:    "**You are going to be dodging dicks in prison for the next 60 years."**

At 14:17.20, Sgts. Boyd and Winbush continued to threaten Perry by stating the following:

> **Sgt. Boyd: Perry, you are 17 years old.**
>
> **Sgt. Winbush: The one thing you have is time.**
>
> **Sgt. Boyd: You have time, you can save yourself. You continue to say you didn't know what happened everybody in this fucking office, in the DA office and courtroom is going to look at you as a fucking monster, you might as well grow fucking horns. If you talk about what fucking happened and you acknowledge your mistake, all this shit is a mistake. You understand what I am saying…You are not a bad dude. You are a kid. You are a fucking kid. You can definitely save yourself because you are a kid.**

Thus, despite detectives' threats and psychological mind games, 17-year-old Perry

consistently and constantly maintained his innocence for almost three hours.

> b.    At 14:01.10, after almost three hours of questioning in a cold

interrogation room with no bathroom breaks, no water breaks, and no snack breaks, Sgt.

Winbush refused to allow Perry to terminate the interrogation.    The following exchange

took place between Sgt. Winbush and Perry:

> **Perry: When y'all going to let me go home?**
>
> **Sgt. Winbush: Whenever I get ready.**
>
> **Perry: When you get ready? How long y'all gonna have me?**
>
> **Sgt. Winbush: Until I wanna let you go.**
>
> **Perry: On God.**
>
> **Sgt. Winbush: On God. ("On God" is slang for final word or the**

**truth).**

However, MPD's Advice of Rights form, which is based on the Fifth Amendment protections, specifically states the following: "If you decide to answer questions now without a lawyer present, you have the right to stop answering questions at any time." Thus, by refusing to allow Perry to terminate the interrogation, Sgt. Winbush violated 17-year-oldPerry's basic fundamental right to end questioning at any time. Refusing to allow Perry to terminate the interrogation and leave amounted to false imprisonment.

        c.    At. 14:02, Sgts. Winbush and Boyd also refused to allow 17-year-old Perry to call his aunt, who was his guardian. After Sgt. Winbush said, "On God," Perry tried to terminate the interrogation by requesting to make a phone call and the following colloquy took place:

> **Perry: Can I make a phone call?**
>
> **Sgt. Winbush: No. (Sgt. Boyd then walks in the room holding up a folder).**
>
> **Perry: Can I make a phone call? (asking Sgt. Boyd and Sgt. Boyd ignores Perry.)**
>
> **Perry: I got a right to make a phone call. (Sgt. Boyd again ignores him holding up a folder)**
>
> **Sgt. Boyd: Perry, do you know what this is? Do you see the name all over this shit?**

Sgt. Boyd and Sgt. Winbush not only violated Perry's fundamental right to make a phone call to contact his guardian to end the interrogation, but Sgt. Boyd's psychological mind games on 17-year-old Perry was wholly inappropriate and illegal.

d.      For almost three hours, Perry consistently and constantly maintained his innocence and told the detectives who others said committed the murder.   At 13:52.50, Sgt. Winbush asks Perry four times repeatedly did he pull the trigger.   Each time Perry says, "No."   Sgt. Winbush then asks Perry five times repeatedly who killed that woman.   Perry says, "Dmack" each time and Perry then says, "I am going to keep saying Dmack did it.   That lady was cool with me."   The detectives made sure Perry understood he would not be allowed to terminate the interrogation until detectives received the responses they wanted.

e.      Officers Beaty and Cockman used a ruse to arrest Perry.   They told Perry that they were arresting him because they wanted to know the whereabout of "Kneebaby," and if he told them Kneebaby's whereabout, he would be set free.   When he waived his *Miranda* rights, Perry believed he was there to talk about Kneebaby, a person who he did not know.   At 12:31.30 (video time/the video), after signing the waiver, the following colloquy takes place between Sgt. Boyd and Perry:

**Perry: What does Kneebaby have to do with me?**

**Sgt Boyd: They mentioned something about Kneebaby?**

**Perry: You tell us where Kneebaby is hiding we let you go.**

**Sgt. Boyd: You in the homicide office and do you know what that means?**

**Perry:   Someone died.**

Perry had already waived his Fifth Amendment rights before Sgt. Boyd informed Perry of the charge or allegations against him.

9

9.      Sgt. Boyd and Sgt. Winbush are very experienced officers and their conspiratory actions on video reflect a customary practice of such tactics.    Sgt. Boyd and Sgt. Winbush's tactics are a direct reflection of the City of Memphis's lack of training in the area of custodial interrogations.    This is underscored by the fact 17-year-old Perry's interrogation was videotaped and that other officers were watching and participating, in real time, in a separate room, providing additional questions and tactics to use against 17-year-old Perry. Videotaping of interrogations was implemented as a safeguard, but it was insufficient to curtail Sgt. Boyd, Sgt. Winbush, and Officers John Does' illegal and customary tactics.    The officers utilized outdated and illegal tactics, while illegally detaining 17-year-old Perry against his will.    The officers' actions caused Perry's unlawful detention and false imprisonment.    Sgt. Boyd and Sgt. Winbush also conspired with Officers John Does to violate Perry's Fifth and Fourteenth Amendment rights. Additionally, as demonstrated further below, poor training implemented by Chief Cerelyn Davis and the City of Memphis of its officers caused Sgt. Boyd, Sgt. Winbush, Sgt. Acred, Officer Cockman, Officer Beaty, and Officers John Does to violate collectively and separately Perry's basic fundamental rights under the Fourth and Fourteenth Amendments.    Chief Cerelyn Davis and these experienced officers were well aware of these clear and well established rights and the requirement of probable cause.    Further, Sgt. Acred, Officer Beaty, Officer Cockman, Sgt. Winbush, Sgt. Boyd, and Lt. Beasley collectively and separately made, influenced and participated in the decision to initiate a prosecution without probable cause, resulting in malicious prosecution of 17-year-old Perry.

10.    On December 4, 2024, the United States Department of Justice, Civil Rights

Divisions, and the United States Attorney's Office of the Western District of Tennessee

issued a report, "Investigation of the Memphis Police Department and the City of

Memphis," which states the following: "We also have serious concerns that MPD's

interrogations of children may lead to involuntary and false confessions in violation of the

Fourteen Amendment."   Sgt. Winbush and Sgt. Boyd's tactics and treatment of Perry

corroborated the report's findings.

## II. JURISDICTION AND VENUE

11.    The jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 1331 and

1343; 42 U.S.C. §§ 1983, 1985, 1986, and1988; and pendant or supplemental jurisdiction

over state law claims pursuant to 28 U.S.C. § 1367.

12.    Upon information and belief, venue is proper in this Court under 28 U.S.C.

§ 1391(a) because all Defendants reside in the State of Tennessee and at least one of

the Defendants resides in the Western District of Tennessee.   Venue is also proper in

this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences

giving rise to this action occurred in Memphis, Tennessee, which is in the Western District

of Tennessee.

## III. PARTIES

13.    Plaintiff, Ladarrius Perry, is an adult citizen of the United States and of the

State of Tennessee.

14.    Defendant City of Memphis is a municipal entity located in Shelby County,

Tennessee, recognized by the State of Tennessee as a properly organized and legal

municipal entity and existing under and by virtue of the laws and the Constitution of the State of Tennessee.

15.    The City of Memphis fulfills its policing duties and responsibilities through the Memphis Police Department, a law enforcement agency.

16.    The Memphis Police Department is led by the Chief of Police.   The Chief of Police is responsible for the implementation of policies, procedures and practices. The Memphis Chief of Police is also responsible or the overseer of police training and supervision.  At all relevant times, as it relates to factual assertions in this Complaint, Cerelyn Davis was the Chief of Police.

17.    At all relevant times, as it relates to factual assertions in this Complaint, Sgt. Acred was a duly appointed and sworn Memphis Police Officer, acting under color of law and acting within the scope of his employment with the City of Memphis.

18.    Upon information and belief, Sgt. Acred is a citizen of the United States and the State of Tennessee. Defendant Sgt. Acred is being sued in both his official capacity as an officer of the Memphis Police Department and in his individual capacity for actions taken by him individually.

19.    At all relevant times, as it relates to factual assertions in this Complaint, Sgt. Boyd was a duly appointed and sworn Memphis Police Officer, acting under color of law and acting within the scope of his employment with the City of Memphis.

20.    Upon information and belief, Sgt. Boyd is a citizen of the United States and the State of Tennessee. Defendant Sgt. Boyd is being sued in both his official capacity as an officer of the Memphis Police Department and in his individual capacity for actions

12

or inactions taken by him individually.

21.    At all relevant times, as it relates to factual assertions in this Complaint, Sgt. Winbush was a duly appointed and sworn Memphis Police Officer, acting under color of law and acting within the scope of his employment with the City of Memphis.

22.    Upon information and belief, Sgt. Winbush is a citizen of the United States and the State of Tennessee. Defendant Sgt. Winbush is being sued in both his official capacity as an officer of the Memphis Police Department and in his individual capacity for actions or inactions taken by him individually.

23.    At all relevant times, as it relates to factual assertions in this Complaint, Officer Beaty was a duly appointed and sworn Memphis Police Officer, acting under color of law and acting within the scope of his employment with the City of Memphis.

24.    Upon information and belief, Officer Beaty is a citizen of the United States and the State of Tennessee. Defendant Beaty is being sued in both his official capacity as an officer of the Memphis Police Department and in his individual capacity for actions or inactions taken by him individually.

25.    At all relevant times, as it relates to factual assertions in this Complaint, Officer Cockman was a duly appointed and sworn Memphis Police Officer, acting under color of law and acting within the scope of his employment with the City of Memphis.

26.    Upon information and belief, Officer Cockman is a citizen of the United States and the State of Tennessee. Defendant Cockman is being sued in both his official capacity as an officer of the Memphis Police Department and in his individual capacity for actions or inactions taken by him individually.

27.    At all relevant times, as it relates to factual assertions in this Complaint, Officers John Does, who participated in Perry's custodial interrogation by providing questions and tactics, were duly appointed and sworn Memphis Police Officers, acting under color of law and acting within the scope of their employment with the City of Memphis.

28.    Upon information and belief, Officers John Does are a citizen of the United States and the State of Tennessee. Defendants John Does are being sued in both their official capacity as officers of the Memphis Police Department and in their individual capacity for actions or inactions taken by them individually.

## IV. STATEMENT OF FACTS

### The Warrantless Arrest Without Probable Cause

29.    On December 20, 2020, officers responded to shots fired in the area of King Street in Memphis, Tennessee.   The area/location is near a neighborhood store.   At the location of 462 King Road, officers located a female suffering from two gunshot wounds. The female, later identified, was pronounced dead at the scene. Crime Scene Investigators determined that the victim had been killed.   They located 3 spent .22 caliber casings at the scene.   The victim was known in the neighborhood as a person who walked the streets asking for money.   It is alleged that she also had a crack cocaine habit. There were no witnesses to the shooting.

30.    Detectives canvassed the area and neighborhoods looking for any video surveillance. Detectives determined through one video that the victim flagged down a silver vehicle some time prior to her murder.   Another video depicted the victim

approaching a gold Mercedes and walking away while yelling at someone in the vehicle. As the victim walked away, the gold Mercedes followed the victim until they both were out of sight on the video.

31.    One individual told the detectives that he heard the suspect/the killer was driving a gray car. Several individuals told detectives that the victim was killed by her drug dealer because she owed money to him. Detectives also received information that the victim owed $150.00 to the alleged drug dealer and had been recently "jumped" by him and his girlfriend because of the debt.

32.    On December 22, 2020, detectives obtained and watched a video from the residence of 3215 Winslow.   The video depicts that on December 20, 2020, at 1:37 p.m., a female, who appears to be the victim, walking past 3215 Winslow.   On December 20, 2020, at 1:50 p.m., the RTCC camera at Ford and King Street depicts a male walking towards the neighborhood store and then suddenly turns around while looking back towards Millwood.   Moments before the male turns around, a white Malibu leaves the store and drives on King towards Millwood. It is important to note that when the Detectives watched the video, (on December 22, 2020), they did not view anything of any significance in furtherance of their investigation.

33.    As of January 2021, the investigation had come to a standstill and was in fear of becoming a cold case.

34.    Approximately three months later, on March 17, 2021, Homicide detective/Sgt. Acred decided to watch the 3215 Winslow video again.   Sgt. Acred now asserted that he was able to see, "what appeared to be two individuals running N/B in the

direction away from where the shooting was." He noted in his report that the first individual appeared to be running, and the other individual was a few seconds behind and may have been walking or jogging." Sgt. Acred further concluded they appeared to have gone to 3198 Millwood.

35.     Sgt. Acred's assertions are misleading, false and recklessly disregard the truth given the angle of the footage and its poor quality of the video. The video did not depict any residence that the individuals entered, and there were other residences nearby that the alleged individuals could have entered. Furthermore, there was no evidence to support that the individuals were even together or acquainted with one another. The poor quality and lack of clarity of the video make it impossible for Sgt. Acred or anyone else to determine any characteristics of the individuals (sex, race, size, height, etc.) or their clothing from the video. Unless one repeatedly watches the video, one can only see silhouettes of individuals.

36.     Approximately one week later, on March 25, 2021, Sgt. Acred, Sgt. Ammons, and Detective Todd went to 3198 Millwood. They went there to meet Crystal Sullivan who resided at the home and who they had previously interviewed on the day of the murder. (On the day of the murder, Officers went door to door talking to residents about the incident.). Also present in the residence was Ms. Sullivan's 16-year-old son, Christopher Sullivan, her nephew Kenneth, and her friend Quita.

37.     Detectives requested and Ms. Sullivan allowed the detectives to search her residence. The detectives did not find any evidence connected to the crime or any crime. The detectives then asked Ms. Sullivan and her son, Christopher, to come to the homicide

office for an interview.   Ms. Sullivan agreed to do so and allowed her son to be interviewed as well.

### Interview of Crystal Sullivan

38.    Detectives interviewed Ms. Sullivan.   Prior to the interview, they presented Ms. Sullivan with a document to read containing the *Miranda* Rights Warning.   She read the document and agreed to answer their questions without the presence of an attorney. The interview began with Sgt. Acred reminding Ms. Sullivan of her comments to the officers on the day of the murder when she volunteered to speak to the officers. She told them that the victim had stolen her nephew's Black and Mild cigars.   She acknowledged her previous conversation and went on to tell the detectives that her nephew, Marquis Jones, had moved out of town.   The detectives asked where Mr. Jones lived and she told them that he lived in Texas.

39.    Sgt. Acred went on to explain to her that he believed that two individuals were seen on a video running from the scene of the shooting into her house.   Ms. Sullivan advised that she was not at home during the time of the shooting.   She stated that her son Christopher, her friend Quita, her son's friend D'Mario Owens (known as Dmack), and possibly her son's friend Jaylen were in the house at that time. She denied any knowledge of or any involvement in any crime. She stated that when she arrived home only Quita and her sister were in the house.

40.    The detectives asked for permission to examine her phone.   After examining the phone, the detectives advised Ms. Sullivan that her phone showed that she was at home the whole day.   When confronted with this information, Ms. Sullivan

17

informed the detectives that she sometimes leaves her phone at home with her kids. Sgt. Acred asked her again who was in her home on the day of the homicide when he knocked on her door.  She replied Quita and her sister and that everyone else had scattered.   Sgt. Acred then asked her if she had seen her son or any of his friends with a gun.   She stated she had seen Dmack with a sort of long gun with a scope on it.   After her interview with the detectives, Ms. Sullivan gave detectives consent to speak to her 16-year-old son, Christoper Sullivan.

**Interview of Christopher Sullivan**

41.    Sgt. Acred and Sgt. Ammons interviewed 16-year-old Christopher Sullivan (Christopher herein) in the presence of Ms. Sullivan.   Prior to coming to the Homicide office, 16-year-old Christopher advised that he had smoked marijuana with his aunt.   Ms. Sullivan then advised the detectives that Christopher has been diagnosed with ADHD. Christopher was provided his *Miranda* Rights Warnings and he waived them.   He agreed to speak with the detectives without an attorney.

42.    In his report, Sgt. Acred stated the following: "Christopher stated that on the day of the murder, his friend Perry and Perry's cousin A.J. aka T.K. were there at his home.   He said they ran into his house.   He said, "He did not see them walk in with a gun in their hand."

43.    Sgt. Acred recalled Ms. Sullivan stated during her interview that Dmack was in the house when she left that day.    Sgt. Acred asked Christopher if Dmack was at the house and Christopher then said Dmack had been there that day.   "He [Christopher] said that Dmack had left to walk to the store.   T.K. stayed in the house.    Perry then left out.

18

T.K. was trying to leave after Perry but could not because he was already in trouble, but he left out a little after Perry.   He said Dmack did not come back.   Christopher said he did not go because he was in a mood swing and was mad at people at the house."

44.    Christopher further said that Dmack later contacted him and said, "Something went down," and that "somebody died that day."   Christopher told Sgt. Acred and "he guessed it was the bright lady."   Christopher said he asked Dmack, "If it was y'all?"   Dmack said, "Who is y'all," and Dmack said, "Yeah." Christopher then gave the officers a physical description of Dmack, told them where he lived, and identified his Facebook page.

45.    Sgt. Acred stated in his report that "Christoper stated Dmack said we shot her because she needed to stop playing with folks' money.   He said T.K. is always into something. T.K. recently stole a car.   Tracy took money from T.K. when he was in 7th grade.   T.K went in the store and came out and she asked for a dollar.   T.K gave her $5.00 and she came back out and gave him $1.00. Christopher denied knowing about an incident with the victim a couple of days before.   Sgt. Acred explained to him about trying not to minimize his involvement.   He continued to deny being at the scene of the shooting."   The detectives then left the room.

46.    The report further stated,

The detectives went back into the room and Sgt. Acred again asked Christopher what order his friends left the house.   He said Dmack left to go to the store.   He said Perry left and TK stayed but then left.   Perry and TK came back and Dmack was initially walking with them, but he wasn't with them no more. [Ms. Sullivan] said Dmack left that day in a Lyft.   She said he always took a Lyft to get home.

19

47.    In his report, Sgt Acred also stated,

He showed him [Christopher] the photo with him holding the rifle and he
said that was him.   He said the gun he was holding belonged to Dmack and
he thinks it was a .22 caliber. (The victim was killed with a .22 caliber
weapon.).   Sgt. Acred asked him if Dmack had the gun that day.   He had
the gun that morning.

### Interview of D'Mario Owens aka Dmack

48.    On the same day, at 8:20 pm, Sgt. Acred and Sgt. Ammons located D'mario

Owens, arrested him, took him into custody, and transported him to the homicide office.

(Again, detectives did not have probable cause to arrest Owens solely on the statement

of Christopher Sullivan, and Christopher never implicated "Dmack" in the murder.).

Because Owens was 16 years old at the time, Sgt. Acred contacted Owens' mother and

she told him that Owens's father would be coming to the homicide office.   When Owens's

father arrived, detectives explained the nature of their investigation and Owens's father

allowed Owens to be interviewed in his presence.

49.    Sixteen-year old Owens stated, "He used to be a friend of Chris, but

something happened, and they were no longer friends. He said he used to go over to

Chris's house, but he was not there on the day of the shooting.   He denied being there

several times."   Owens gave the detectives consent to search his phone.   Detectives

checked Owens's Lyft app but did not see any ride history.   Owens said he also uses

Uber.   Detectives checked Owens's Uber app, and it did not show any ride history on

December 20, 2020.   Detectives released Owens to his father.

50.    On April 16, 2021, after mapping Owens' cell phone records, detectives

determined that on December 20, 2020, at 12:30 p.m., Owens was in the area of

Germantown Road and Brother Blvd.   Detectives then concluded, "This means, Owens would have to go from Germantown Road to the scene in approximately 15 minutes." Detectives realized Christopher and his mother were not being truthful.   Detectives then ruled out Owens as a suspect.

**Attempted Interview of A.J. aka T.K.**

51.    On the same day of Christopher Sullivan's interview, officers located A.J., arrested him, took him into custody, and transported him to the homicide office.   (Again, detectives had no probable cause to arrest A.J. solely on the statement of Christopher Sullivan who detectives know, at this point, has no credibility.).

52.    A.J.'s mother arrived at the office, and they explained the circumstances to her.   His mother said she would rather him have an attorney present.   She was allowed to call his uncle who is an attorney.   The officers spoke to his uncle, the attorney, and the uncle advised A.J. not to make a statement.   A.J. invoked his rights not to speak with the detectives.   The detectives contacted the D.A.'s. office and was advised to release A.J.   It is important to note that A.J. is the first cousin of Perry and A.J.'s mother is Perry's aunt and guardian.   A.J. and Perry's uncle is an attorney.

**Sgt. Acred makes Perry a Person of Interest**

53.    On April 10, 2021, with no credible evidence concerning Perry's involvement in any murder, Sgt. Acred wrongfully added Perry as a person of interest in Watson, a law enforcement database.   As a result, on July 28, 2021, Multi-Agency Gang Unit (MGU) officers, B. Cockman and C. Beaty, located Perry and made a warrantless arrest without probable cause of Perry. (Exhibit 3).   Officers Cockman and Beaty

arrested Perry, under a ruse or false statement.   The officers told Perry that once they arrived downtown and Perry told them the whereabout of "Kneebaby," the officers would let him go.

56.     The above shows customary practice of arresting juveniles without probable cause.

## FACTS OF PERRY'S INVOLUNTARY STATEMENTS
## INTERROGATION IN VIOLATION OF HIS FIFTH AMENDMENT

### Detectives Violated Perry's Basic Fundamental Rights

57.     Even though Perry was only a "person of interest," the detectives arrested him and placed Perry in the interrogation room.   They also handcuffed one of his hands to a chair and placed shackles around both ankles.   The treatment of Perry was video-taped, and he was placed in a room where John Doe officers could watch and provide input "real time" concerning Perry's custodial interrogation.

58.     At 11:14.20 a.m., the video depicts the first thing Perry says, "What do I have to do with Kneebaby?"   The arresting officers previously told Perry that they were arresting him because they wanted to know the whereabout of "Kneebaby," and if he told them "Kneebaby's whereabouts," Perry would be set free.   However, Perry did not know any individual by the name of "Kneebaby."

59.     At 12:15.45 to 12:16, the video depicts the following discussion between Sgt. Boyd and Perry:   Sgt. Boyd comes into the interrogation room and says, "You scared the shit out of me.   What's up, man?"     Perry asks Sgt. Boyd did they contact his aunt. Sgt. Boyd replies, "Yes, she said she is not coming down here." In uttered disbelief, Perry says, "She said that?"   Sgt. Boyd replies, "Yes." Perry, again in uttered disbelief, says,

"For real!"   Sgt. Boyd replies, "Ms. Crowder?"   Perry says, "Yes."   Sgt. Boyd then repeats the phone number that Perry gave him. Perry says, "Yes, you dead serious!" Sgt. Boyd replies, "Yes, she said she ain't coming down."   Perry responds, "Why not, can I talk to her then."   Sgt. Boyd replies, "You can't talk to her right now G.   We are getting ready to talk to you."   Perry says, "I am ready to gone talk to y'all." (Perry believes the interview is about "Kneebaby" who he does not know.). Sgt. Boyd replies, "We are getting ready to talk to you.   I am going to get this sheet and come right back, ok bruh.   Give me a second."   Detectives knew Ms. Crowder, Perry's legal guardian, declined, on the advice of her attorney, to allow her son, A.J./T.K., to speak to detectives, and detectives knew she would do the same for Perry.   Thus, detectives refused to allow Perry to speak directly with his legal guardian, exercising his fundamental right as a juvenile to consult with an adult before speaking to law enforcement.

### Cold Temperature Interrogation Tactic

60.    Using the cold temperature interrogation tactic, detectives placed Perry in a very cold interrogation room from 11:14 a.m. to 12:28 p.m., more than an hour before the interrogation began.   Perry was wearing only a sleeveless shirt/tank top, pants, and open-toe sandals.   During the time Perry was alone in the interrogation room, Perry complained and talked out loud to himself about how cold he was.

61.    The video depicted Perry at different times talking to himself about his coldness in the room.   Perry says the following:

11:18.30 "It's cold as hell in here."

11:20.40 "Come on."

11:23.00 "It's colder than motherfucker."

11:24.30 "It's cold as hell."

11:27.10 Perry again complains about how cold it is. Perry continues to sit in the cold alone.

62.    At 12:32.20. (the interrogation began at 12:28),   Perry is sitting in front of both detectives with both arms inside his shirt showing the detectives that he is cold.   As a result, Sgt. Boyd asks Perry if he is cold.   Perry replies, "Yes."   Sgt. Boyd replies, "Do you want a jacket or something?"   Perry responds, "Yes, Sir."    Sgt. Boyd replies, "I will get you one in just a second."   However, detectives never stopped their interrogation to give Perry a jacket.

63.    At 14:39.19, after almost three hours and shortly after Perry's involuntary confession, Sgt. Boyd provides Perry with a jacket.   Thus, Sgt. Boyd and Sgt. Winbush consciously, willfully and illegally used the cold temperature interrogation tactic to ensure Perry succumbed and confessed to the crime.

**Isolation Interrogation Tactic**

64.    In  addition  to  the  cold  temperature  interrogation  tactic,  detectives strategically, willfully, and illegally used the isolation interrogation tactic.   When the video begins and as he is about to leave the room, Sgt. Boyd says, "Tap on the door if you need anything and I will be right back."

65.    Detectives left Perry in a very cold room and isolated for a significant period of time before interrogating him.   (Detectives would **not** have used this tactic if Perry's legal guardian was present.).   The isolation interrogation tactic is meant to make Perry anxious to waive his Miranda rights to talk to detectives when they return to the room.

24

While in isolation alone in the room, Perry yells the following:

11:20.40    "Come on!"

12:05.10    "Excuse me, I am ready to go home!"

12:07.16    "Come on Big Dog!"

12:08.30    "Excuse me!"

12:10.01 "I want to go home and excuse me, it's too long!"

12:12.35    "I want to go home."

12:13.53    "Someone needs to come and help me!"

66.    Furthermore, Officers John Does, Sgt. Boyd, and Sgt. Winbush are watching Perry's behavior/actions in another room and ignoring Perry's requests to leave or to start the interview until they know they have broken Perry's spirit.

67.    Additionally, Officers John Does, Sgt. Boyd, and Sgt. Winbush's isolation interrogation tactic made Perry take the following actions to get the detectives' attention (who were watching) to be released or to exit the room:

12:03.46    As Sgt. Boyd instructed Perry to tap/knock on the door if he needed anything, Perry begins moving to reach to tap/knock on the door, but he is unable to reach the door due to being handcuffed to a chair and shackles around his ankles.  Perry then takes off one of his sandals and begins reaching and leaning towards the door and using the sandal "to tap" on the wall to gain the detectives' attention.

12:06.50   Perry begins knocking on the wall with his uncuffed hand to obtain detectives' attention.

12:07.16    Perry continuously knocks on the wall.

12:09.16    Perry again begins knocking on the wall non-stop trying to get detectives' attention.

12:10.01    Perry again begins knocking on the wall nonstop and says,

25

**"They are watching me."**

12:11.08 In his frustration, desperation and panic, Perry pulls his hand out of the handcuff and then reaches to pull open the door, but Perry cannot open the door.  Perry now knocks, with his hand, directly on the door. Perry again takes off his shoe and uses his shoe to press a button on the door that triggers an alarm.  The alarm sounds.  No one comes to the door. (Again, detectives are watching all of this from another room.).

12:13.10 Perry drops his head down, shaking his head in utter disbelief and brokenness about how he is being treated.

12:14.44 Perry again takes off his shoe and again begins pressing the button/alarm on the door.  Perry stares at the door and then begin to talk to himself.  Perry again presses the button/alarm.    Perry then again begins knocking on the door.  (Again, detectives are watching all of this from another room.)

68.    The detectives, who are watching 17-year-old Perry's frustration, desperation and panic on video from another room, start the interrogation when they know Perry is emotionally, mentally, and physically broken.

69.    Despite being emotionally, mentally, and physically broken, Perry maintained his innocence for almost three hours.

**The Interrogation techniques of Threats and Promises**

70.    Arresting officers had previously told Perry that they were arresting him because they wanted to know the "whereabouts of Kneebaby," and if he told them "Kneebaby's whereabouts," Perry would be set free.   However, Perry did not know any individual by the name of "Kneebaby."

71.    Perry waived his Miranda rights believing he was there to talk about Kneebaby, a person who he did not know.   At 12:31.30, after signing the waiver, Perry immediately says, "What does this have to do with Kneebaby."   Sgt. Boyd replies, "They

mentioned something about Kneebaby?"   Perry states, "Yes, you tell us where Kneebaby is hiding we will let you go."   At 12:44 -12:45, after Perry had waived his Miranda rights and almost 20 minutes into Perry's interrogation, Sgt. Boyd tells Perry that he is in the homicide office and does he know what that means.   Perry responds, "It means someone died."

72.     Almost from the beginning of the interrogation, Sgt. Boyd and Sgt. Winbush, barraged Perry with verbal threats, including to charge Perry's 13-year-old cousin A.J./T.K. with the murder, and made promises (the case will be handled in the juvenile system).   Here are some example of the detectives' threats to Perry:

    a.     12:50.10   Sgt. Boyd says, "You are 17 right now.   What they normally get about 60 or 70 years.   You will be about 80 or 87 getting out of prison and that's if you get a good deal.   You will spend the majority of your life behind bars to get us to swallow that bullshit story." [Perry responds, "I ain't did nothing."]

    b.     12:51.25   [Perry tells the officers that Chris said Dmack did it.]. Sgt. Boyd asks Perry, "Do you know what self-preservation is." [Perry replies, "No."]   Sgt. Boyd tells Perry, "A lie will cause you to end up in prison for the rest of your life."   [Perry continues to say people told him that Dmack did it.]

    c.     13:05.15 Sgt. Boyd tells Perry if he does not tell what happened, he is going to spend the next 70 years in prison. He tells Perry that it is time to save yourself.

    d.     13:16: Sgt. Boyd says, "You are not telling the truth.   Perry, your motherfuckin ass is going to jail."

    e.     13:31.05 Sgt. Boyd tells Perry that he is now pissing him off. [Perry says he didn't do it. ]

    f.     13.51 Sgt. Boyd says, "It's a lot of motherfuckers right now sitting in prison facing decades because they thought they were smarter. You are 17 fucking years old and I have been doing this job for 17 years.

Don't think you can come here fucking bullshit us. It's not going to fucking work. It didn't work for them and it's not going to fucking work for you…[Perry says, "They said I did it?   They are lying on me; I swear to God on my soul."]

g.     13:54.00   Perry begins knocking on the wall. Perry begins talking to himself saying, "Y'all do not believe nothing I say and y'all keep talking to me.   Perry is continuously knocking on the door. Sgt. Winbush eventually opens the door and walks in.   Perry is standing up trying to talk. Perry says, "Big Bruh?"   Sgt. Winbush replies, "Did I say sit down."   Perry says, "Can I talk to you?" Sgt. Winbush responds, "If you are getting ready to waste my motherfuckin time?"   Perry says, "Big man, I am not gonna waste your time."   Sgt. Winbush says, "Now tell me what happened?" Perry remains standing. Perry replies, "I told y'all."   Sgt. Winbush says, "Sit your ass down."   Perry says, "Yall going to send me to juvenile after this." Sgt. Winbush says, "Sit down!... "Tell me what motherfucking happened." Perry replies, "Boss man, Dmack did it, bruh. I ain't got no reason to lie. I am telling the truth.   Dmack did it." Sgt. Winbush says, "TK (Perry's 13-year-old nephew) did it."   Perry replies, "No." Sgt. Winbush says, "You are trying to save your cousin, he's blood. He is your family, he's yo family, so you are trying to save motherfucking family."   Perry replies, "No, I am not big bruh. He didn't do it." Several times Sgt. Winbush says yes, he did and several times Perry replies no, he didn't. Sgt. Winbush says, "I feel TK did that shit." There is a few seconds of silence.   Perry says, "Them folks just turn that stuff on me." Sgt. Winbush stands up, points to the wall and says, "Don't be beating on my wall. I **got to use the bathroom."   Perry replies, "I do too." (Sgt. Winbush ignores Perry's request to use the restroom.).

h.     14.01 – 14.01.21 [Perry asks, "When y'all going to let me go home?"] Sgt. Winbush replies, "Whenever I get ready." [Perry replies, "When you get ready? How long y'all gonna have me?"]   Sgt. Winbush replies, "Until I wanna let you go."   [Perry replies, "On God."] Sgt. Winbush replies, "On God." ("On God" means what I am saying is truth).   Perry again says, "Can I make a phone call?" Sgt. Winbush replies, "No." Sgt. Boyd walks in the room holding up a folder and Perry asks Sgt. Boyd, "Can he make a phone?"   Sgt. Boyd ignores him.   Perry says, "I got a right to make a phone call." Sgt. Boyd ignores him and holding up a folder and asks Perry, "Do you know what this is? Do you see the name and shit on it?"

i.     14:04   Sgt. Boyd tells Perry that he is still at the point that he can save himself because he is still a juvenile and he is not really facing much. Sgt. Boyd further says if they try him as an adult because he has no remorse and just don't give a fuck that "You are going to be dodging dicks in prison for the next 60 years because they feel like you don't give a fuck."

28

Sgt. Boyd stated, "On the other hand, you have people say that they did x, y, and z and they say sorry, lost their temper and the courts try to work with them."

      j.      14:15.50 Sgt. Winbush says, "You know why people get 60, 70, 80 years because they lie about it…"

      k.      14:17.20 Sgt. Boyd says, "Perry, you are 17 years old."  Sgt. Winbush says, "The one thing you have is time."  Sgt. Boyd says, "You have time, you can save yourself. You continue to say you didn't know what happened.   Everybody in this fucking office, in the DA office and courtroom is going to look at you as a fucking monster.  You might as well grow fucking horns. If you talk about what fucking happened and you acknowledge your mistake, all this shit is a mistake.   You understand what I am saying.  You are not a bad dude. You are a fucking kid. You can definitely save yourself because you are a kid. "

      l.      14:20. Sgt. Boyd says, "You tell us what happened and when your day comes in court, we can honestly tell them he did show remorse and he fucked up and he made a mistake and we can lay it on the line for you verses he didn't say shit.   We have shit on fucking video and he is in here lying…." (As previously stated above, there were no witnesses to the murder and Sgt. Boyd is lying to Perry.)

73.    Despite the detectives' barrage of threats and promises, Perry maintained his innocence for hours before succumbing to their unlawful pressure.

74.    After Perry confessed to the crime, Sgt. Acred, Sgt. Winbush, and Sgt. Boyd's actions caused, influenced, drafted, and participated in an Affidavit of Complaint to be issued charging Perry with First Degree Murder, in violation T.C.A. § 39-13-202.

75.    On July 18, 2021, as the affiant, Sgt. Boyd made, influenced and was sworn to the following in the Affidavit of Complaint:

On 12/20/20 at 1410 hrs MPD officers responded to a man down call at 462 King rd where they located a female suffering from gunshot wounds to the head and torso.   The female gunshot victim was identified as [the victim], who was pronounced deceased on the scene.   During the course of the investigation, Detectives located video that show two unknown males

running from the direction of the shooting scene and appeared to run into 3198 Milwood. Investigators interviewed residents of 3198 Millwood, Christopher Sullivan, and discovered that Ladarrius Perry and another juvenile ran into the residence and to the back around the time of the shooting. Ladarrius Perry, male 17 years old, was developed as a person of interest. On July 18, 2021, MGU officers were conducting enhanced patrol in the area of Ford and King and checked a suspicious party who was identified as Ladarrius Perry. Ladarrius Perry was detained and transported to 170 N. Main 10th Floor, Homicide, for further investigation where he confessed to shooting [the victim] on 12/20/2020 because she stole a small amount of money from his cousin.

76. The Affidavit contained false and willful misleading information because the referenced video does not show two individuals running and appearing to run inside 3198 Milwood. (Exhibit 4). Furthermore, with no credible evidence, Sgt Acred placed Perry into Watson, a law enforcement database, as a person of interest, which caused Perry to be unlawfully arrested. This was a custom and practice of Memphis Police Department to detain, to arrest and to take in for questioning individuals, who are deemed a person of interest, when there is no reasonable suspicion to detain or probable cause to arrest the person. This custom and practice of Memphis Police Department to detain, to arrest and to take in for questioning, without reasonable suspicion and probable cause, also apply to juveniles. Finally, the above affidavit contained no probable cause to arrest Perry.

77. Sgt. Boyd further attested, "Therein are true to the best of affiant's knowledge, information and belief and that said child presents a danger to him/herself or others, said child is likely to abscond and the said child will not respond to a juvenile summons." (Exhibit 4). Sgt. Boyd's attestation sought to ensure that Perry was incarcerated pending trial or that an extremely high bond would be set for Perry, ensuring his incarceration pending resolution or trial. Sgt. Boyd's actions caused, influenced, and

30

participated in the decision to initiate a prosecution without probable cause against Perry, and Sgt. Boyd's action caused Perry to be falsely imprisoned for almost two and a half years.

78.    On October 16, 2021, Sgt. Boyd signed and executed Perry's Arrest Report. (Exhibit 2).   On October 25, 2021, Lt. Beasley signed and executed the Arrest Report as Sgt. Boyd's supervisor, knowing the Arrest Report did not support probable cause to arrest Perry. (Exhibit 2). The Arrest Report included a heading, "**Probable Cause**," and under the heading, it contained almost verbatim the above statement of facts in the Affidavit of Complaint. The Arrest Report only added, "Perry read and waived his Miranda Rights."   Lt. Beasley abandoned his duties as a supervisor and based on customs and practices, he signed and executed Perry's Arrest Report, influencing and participating in the decision to initiate a prosecution against Perry without probable cause.   The Arrest Report listed the following investigating officers:   Sgt. J. Boyd as Homicide Case Coordinator, Sgt. W. Acred as Assist Case Coordinator, Sg.t R. Ammons as Assist Case Coordinator, and Sgt. C. Winbush as Assist Case Coordinator.   The Arrest Report indicated all who influenced and participated in the decision to initiate a prosecution against Perry without probable cause.

79.    The Arrest Report also contained the Record of Arrest. (Exhibit 2). The Record of Arrest states, "On July 18, 2021, officers were in the area of Ford Rd and King Rd when they checked Ladarrius Perry as suspicious.   Perry showed to be a person of interest in connection with a Homicide which occurred in December 2020.   Perry was transported to 170 N. Main for further investigation."   (Exhibit 2). The Record of Arrest

corroborates that the officer did not have probable cause to arrest Perry.

80.    The Arrest Report further proves limited investigation conducted by Sgt. Acred and other Homicide detectives.   The report detailed a brief discussion of other possible suspects before investigators turned their investigation to Ms. Crystal and Christopher Sullivan.   The investigation amounted to three interviews:   Crystal Sullivan, Christopher Sullivan and D'mario Owens aka "Dmack."   On April 10, 2021, "Sgt Acred add[ed] Ladarrius Perry as a person of interest in Watson.   END OF SUPPLEMENT." (Exhibit 5).

## VI. STATEMENT OF CLAIMS

### COUNT I
### (Violation of 42 U.S.C. § 1983)

81.    Perry incorporates the allegations of paragraphs 1 through 80 as if fully set forth herein.

82.    Title 42 U.S.C § 1983 provides in part:

Every person who, under color of any statute, ordinance, regulation, customer, or usage, or any state or territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.

83.    Under color of law, the Defendants individually and collectively acted willfully, maliciously, unreasonably, recklessly and with deliberate indifference to violate 42 U.S.C. § 1983, when they violated Perry's constitutional rights under the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution and Article 1 Sections 7, 8 and 9 of the Tennessee Constitution.

84.     The Defendant City of Memphis and the Individual Defendants, in their official capacity and under color of state law, violated Perry's Fourth and Fourteenth Amendment rights, that is, to be free from unreasonable search and seizures and to be free from deprivation of liberty without due process of law.   These rights were clear and well-established at the time of Perry's unlawful seizure, arrest, detention and restraint as described above.   At all relevant times, Defendant Chief Cerelyn Davis and Defendant City of Memphis failed to exercise its ability and duty to prevent the acts or actions described above.

85.     The Defendants, Sgt. Boyd, Sgt. Winbush, and Officers John Does, specifically did violate Perry's Fifth and Fourteen Amendment rights under the U.S. Constitution and Article 1 Section 9 of the Tennessee Constitution, that is, the right not be compelled to be a witness against himself and right not to be deprived of liberty without due process of law as described above.   These rights were clear and well-established at the time of the Defendants utilized their outdated and illegal interrogation techniques and tactics against then 17-year-old Perry.   At all relevant times, Defendant Chief Cerelyn Davis and Defendant City of Memphis failed to exercise its ability and duty to prevent the acts or actions described above.

86.     The Defendants, Officer Cockman, Officer Beaty, Sgt. Boyd, Sgt. Winbush, and Officers John Does, conspired and did violate Perry's Fourth, Fifth, and Fourteen Amendment rights under the U.S. Constitution and Article 1 Sections 7, 8 and 9 of the Tennessee Constitution by collectively planning, aiding and assisting one another and each other to deprive Perry of his clear and well-established rights. At all relevant times,

Defendant Chief Cerelyn Davis and Defendant City of Memphis failed to exercise its ability and duty to prevent the acts or actions described above.

## COUNT II
### (False Imprisonment- Elements)

87.    Perry incorporates the allegations of paragraphs 1 through 86 as if fully set forth herein.

88.    Sgt. Acred caused and Officers Cockman and Beaty did unlawfully detain and restrain then 17-year-old Perry against his will, and the detention and restraint were unlawful because it was without reasonable suspicion, probable cause and judicial authorization.

89.    Sgt. Acred caused Officers Cockman and Beaty did falsely imprisoned Perry against his will without probable cause.   They were well aware of or should have been well aware of their lack of probable cause.

90.    Sgt. Boyd, Sgt. Winbush, and Officers John Does engaged in unlawful detention and restraint of Perry against his will, by refusing to allow 17-year-old Perry to terminate the interrogation and leave the Homicide office.

91.    Sgt. Boyd, Sgt. Winbush, and Officers John Does were well aware of their unlawful detention and restraint of Perry because MPD's Advice Rights form specifically stated a defendant/Perry was allowed to terminate the interview/interrogation at any time.

92.    Sgt. Boyd, Sgt. Winbush, and Offices John Does' unlawful detention and restraint of Perry against his will and without probable cause amounted to false imprisonment of Perry. Additionally, Sgt. Boyd, Sgt. Winbush, and Offices John Does' actions led to Perry's long-term false imprisonment.

93.    Sgt. Acred, Sgt. Boyd, Sgt. Winbush, Officer Cockman, Officer Beaty, and Officers John Does unlawfully detained and restrained Perry against his will and without reasonable suspicious and without probable cause, in violation of his Fourth Amendment rights of the U.S. Constitution and Article 1 Sections 7 and 8 rights of the Tennessee Constitution.

## COUNT III

### (Failure to Train and to Supervise and Customary Practices)

94.    Perry incorporates the allegations of paragraphs 1 through 93 as if fully set forth herein.

95.    Defendant Chief Cerelyn Davis and Defendant City of Memphis failed to train and to supervise adequately its police officers and this failure led to deliberate indifference and wanton disregard for  the rights of persons, especially juvenile defendants, during a custodial interrogation.

96.    Defendant Chief Cerelyn Davis and Defendant City of Memphis allows its officers to use outdated and illegal interrogation techniques and tactics which have long been abandoned in policing.

97.    Defendant Chief Cerelyn Davis and Defendant City of Memphis's lack of training and supervision of its officers, along with its customary practices, are readily identified in Perry's custodial interrogation which involved numerous violations of Perry's basic fundamental rights, such as, refusing to allow Perry to terminate the interview/interrogation, failing to advise Perry of the charges against him before he waived his rights, depriving Perry of breaks and nourishment, and lodging constant threats at 17-

35

year-old Perry.

98.    Defendant Chief Cerelyn Davis and Defendant City of Memphis also failed to establish clear procedures and to train its officers how to treat or to handle a "person of interest" versus a suspect where there is probable cause to arrest.   Defendant City of Memphis's police academy training failed to sufficiently address the difference .

99.    Defendant Chief Cerelyn Davis and Defendant City of Memphis also failed to train officers how to conduct interviews/interrogation of juveniles who are susceptible to manipulation when faced with psychological games and tactics that would overpower the will of most adults.

100.    Defendant Chief Cerelyn Davis and Defendant City of Memphis's failure to train and to supervise its police officers caused then 17-year-old Perry to be unlawfully detained/restrained, false imprisoned, and to be compelled to be a witness against himself, in violation of his Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution and Article 1 Sections 7, 8 and 9 of the Tennessee Constitution.

101.    Defendant Chief Cerelyn Davis and Defendant City of Memphis's failure to train and to supervise its police officers caused then 17-year-old Perry to be subjected to malicious prosecution.

**COUNT IV**
**(Malicious Prosecution- Section 1983 Elements)**

102.    Perry incorporates the allegations of paragraphs 1 through 101 as if fully set forth herein.

103.    In the instant matter, the Defendants' actions were shocking to the conscience.

36

104.    With wanton and reckless disregard for justice and the rights of 17-year-old Perry, Sgt. Acred, Sgt. Boyd, Sgt. Winbush, Lt. Beasley, Officer Cockman, Officer Beaty, and Officers John Does made, influenced and participated in the decision to initiate a prosecution against 17-year-old Perry as described above.

105.    By placing Perry in Watson as a "person of interest" without any evidence of participating or committing any crime, Sgt. Acred influenced and participated in the decision to initiate prosecution against 17-year-old Perry.

106.    When Officer Cockman and Officer Beaty arrested 17-year-old Perry without probable cause and completed their reports, they influenced and participated in the decision to initiate prosecution against 17-year-old Perry.

107.    By using illegal and outdated interrogation techniques and tactics to gain an involuntary confession from 17-year-old Perry, Sgt. Boyd, Sgt. Winbush, and Officers John Does influenced and participated in the decision to initiate prosecution against 17-year-old Perry.

108.    By signing and executing 17-year-old Perry's Arrest Report, Sgt. Boyd and Lt. Beasley made, influenced and participated in the decision to initiate prosecution against 17-year-old Perry.  Sgt Boyd and Lt. Beasley well knew the report delineated facts that failed to support probable cause to arrest Perry.

109.    All Defendants were well aware that the prosecution of Perry lacked probable cause.

110.    As a direct result of all the Defendants' actions, Perry was not only seized without probable cause, but the Defendants' actions caused Perry to spend almost two

and a half years in the Shelby County Jail at 201 Poplar, one of the worst jails in the State of Tennessee.

111.    On December 13, 2023, despite the Defendants' actions, the criminal proceeding against Perry was resolved in his favor when the lone charge of first-degree murder was dismissed against him and later the charge was expunged from Perry's record.

## VIII.   DAMAGES

112.    As a direct result and proximate cause of the Defendants' unlawful actions and deliberate indifference, the Plaintiff's high school experience was cut short and he lost valuable time and moments with family and friends.   The Defendants' actions have caused Perry to suffer deep pain, emotional distress, anxiety, inconvenience, loss of enjoyment of life, and humiliation of spending approximately two and a half years in jail awaiting trial.   To survive jail, Perry adopted a mindset that affects his life choices even today.

113.    The Defendants' unlawful actions were intentional, malicious, and with wanton and reckless disregard for the Plaintiff's rights.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that a jury be empaneled to try the issues raised herein and the Plaintiff also prays for judgment against the Defendants referenced above for the following:

(i) Compensatory damages awarded to now Mr. Perry for both the federal and state court claims in the amount of $5,000,000.00, or an amount the jury may determine just and proper under the circumstances and/or which may be permitted by law;

(ii) Punitive damages against the Defendants;

(iii) Attorneys' fees and costs;

(iv) Pre and post-judgment interest;

(v) Discretionary costs; and

(vi) All such further relief, both general and specific, to which Plaintiff may be entitled or to which he may show himself entitled.

Respectfully submitted,

/s/ *Kevin P. Whitmore*
Kevin P. Whitmore #021293
Attorney Representative of
THE LAST CHANCE LAW FIRM, PLLC
301 Washington Avenue, Suite 202
Memphis, Tennessee 38103
(901) 461-1039
whitmore@lastchancelaw.com